1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

# SOUTHERN DISTRICT OF CALIFORNIA

10

11

MICKEY LEE DILTS, RAY RIOS, AND
DONNY DUSHAJ,

12

Plaintiffs,

13

vs.

14

PENSKE LOGISTICS, LLC, PENSKE
TRUCK LEASING CO., L.P., et al.,

15

16

Defendant.

CASE NO. 08-CV-318 JLS (BLM)

**ORDER: GRANTING MOTION
FOR CLASS CERTIFICATION**

(Doc. No. 55.)

17
18
19
20

Presently before the Court is Plaintiffs' renewed motion for class certification. (Doc. No. 55.) Also before the Court are Defendant's[1] opposition, (Doc. No. 63) Plaintiffs' reply, (Doc. No. 65) Defendant's supplemental opposition, (Doc. No. 69) and Plaintiffs' supplemental reply. (Doc. No. 69.) After fully considering the merits of this matter, the Court **GRANTS** Plaintiffs' motion.

21

## BACKGROUND

22
23

This case presents the Court with claims regarding Defendant's failure to provide lunch and rest breaks, pay overtime compensation, reimburse business expenses, and pay wages due.

24
25
26

Defendant Penske "operates a warehouse, distribution and inventory management services throughout the State of California, and hires hourly employees to engage in the inventory, delivery

27
28

---

[1] This case involves two Defendants: Penske Logistics LLC and Penske Truck Leasing Co LP. Because they share a common factual and legal position they are treated as a single Defendant within this Order.

and installation of a multitude of vendor products." (Memo. ISO Motion at 7.) "During the proposed class period, Penske provided dedicated logistics services to the following customers in California: Big Lots, Pier One, Pepsi, Calvey Packing, KHL, Cardinal Healthcare, Flex Feet, KB Homes, Longs Drugstore [now known as] CVS Drugstore, CSK Auto Parts, Mission Foods, Masterbox, Rite Aid, Sears Lights, Fromica, Masco, Fresno Bee Newspaper, JM Eagle and Whirlpool." (Doc. No. 36 at 2; *see also* Memo. ISO Motion at 7.) The Whirlpool account is the focus of this action. (Memo. ISO Motion at 1.)

To service the Whirlpool account, Defendant "assigned a particular group of hourly employees known as 'driver/installers' (who hold a Class 'B' commercial driver's license) and their 'helpers' or 'installers' (who generally do not hold a commercial vehicle license) to engage in both the off-site delivery and installation of appliances." (*Id.* at 7.) These employees "typically work shifts exceeding 10 hours" and their delivery schedules are created by "a company-wide algorithm program (sic) that is designed to maximize productivity in a given geographic territory and to fully utilize the 'driver/installer's' commercial hours of service limits imposed by state and federal regulations." (*Id.* at 8.)

All three lead plaintiffs worked "out of Whirlpool's Ontario, California facility." (Opp. at 4, 5, & 6.) Both Lead Plaintiff Rios and Lead Plaintiff Dushaj were employed as "installers" while Lead Plaintiff Dilts worked as a "driver/installer." (Memo. ISO Motion at 17.)

Defendant "used a uniform dispatch record that identified a delivery/installation schedule, but did not schedule meal periods for the proposed class." (*Id.* at 8.) Driver/installers were required to document their lunch period on "a pre-printed area on [the dispatch record] form." (*Id.*) "Responsibility to prepare the dispatch log rested solely with the driver/installer; the installer or helpers did not maintain such records." (*Id.*) Defendant "provided each driver/installer a Nextel device for communication with the dispatchers, supervisor and customers during the day" but "did not require the driver/installer teams to use the Nextel to notify the company of meal or rest periods."[2] (*Id.*)

---

[2] Further, "Company policy . . . did not permit the driver/installers to leave their truck unattended, nor were the teams allowed to turn-off their Nextel during breaks." (Memo. ISO Motion at 8.)

1     Because Defendant "expected" the Plaintiffs to take their meal breaks, they utilized "a

2   systematic policy of automatically deducting 30-minutes of work time [to account for those] daily

3   meal periods." (Opp. at 2; Memo. ISO Motion at 9.)  "The deduction was taken without inquiry into

4   whether the employee was actually provided with a timely 30-minute uninterrupted and duty-free meal

5   period or not." (Memo. ISO Motion at 9.)  Defendant also provided no means for "the employee to

6   override the 'auto-deduction' for any day that a meal period was not provided." (*Id.*)

7     In addition, Defendant's "business practices . . . led to an environment that uniformly

8   discouraged and/or prevented [Plaintiffs] from taking meal and rest breaks.  Because many [Plaintiffs]

9   regularly work overtime hours, the common impact of the 'auto-deduction' is magnified because it

10   results in direct loss of 'premium' or 'overtime' wages." (*Id.* at 10 (emphasis omitted).)

11                                          **LEGAL STANDARD**

12     Motions for class certification proceed under Rule 23 of the Federal Rules of Civil Procedure.

13   The question, however, "is not whether the plaintiff or plaintiffs have stated a cause of action or will

14   prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v Carlisle &*

15   *Jacquelin*, 417 US 156, 178 (1974) (quoting *Miller v Mackey Int'l.*, 452 F 2d 424 (5th Cir. 1971))

16   (internal quotation marks omitted).

17     Rule 23(a) provides four requirements that must be met in any class action: (1) the class is so

18   numerous that joinder of all members is impracticable; (2) there are questions of law or fact common

19   to the class; (3) the claims or defenses of the representative parties are typical of the claims or

20   defenses of the class; and (4) the representative parties will fairly and adequately protect the interests

21   of the class.  Fed. R. Civ. P. 23(a).  A proposed class must also satisfy one of the three subdivisions

22   of Rule 23(b).

23     Plaintiffs bear the burden of establishing that their case meets Rule 23's requirements.

24   *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1308 (9th Cir. 1977); *W. States Wholesale, Inc. v.*

25   *Synthetic Indus., Inc.*, 206 F.R.D. 271, 274 (C.D. Cal. 2002).  In evaluating this showing, the Court

26   "is bound to take the substantive allegations of the complaint as true." *Blackie v Barrack*, 524 F.2d

27   891, 901 n.17 (9th Cir 1975).  It may also "consider evidence which goes to the requirements of Rule

28   23 even though the evidence may also relate to the underlying merits of the case." *Hanon v*

*Dataproducts Corp.*, 976 F 2d 497, 509 (9th Cir 1992).  However, weighing competing evidence is inappropriate at this stage of the litigation.  *See Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003).

## ANALYSIS

### I.   CLASS DEFINITIONS

Although it is not explicitly spelled out in Rule 23, Courts require an adequate class definition before they will certify a class.  This definition must identify "a distinct group of plaintiffs whose members [can] be identified with particularity."  *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978).  This Court's Order denying certification focused on this issue.  (*See* Doc. No. 52 (Prior Order).)  Plaintiffs' six proposed classes had two significant problems.  First, "Plaintiffs[] . . . intended these classes to cover only employees working on the Whirlpool account" but did not make that explicit in their class definitions.  (*Id.* at 1–2.)  Second, it would have been extremely difficult to determine class membership without a merits determination.  (*Id.* at 2.)

In their renewed motion for certification, Plaintiffs request certification of one class and twelve subclasses.[3]  The class consists of "349 hourly appliance delivery drivers and installers in California who were assigned to its state-wide Whirlpool account."  (Memo. ISO Motion at 1.)  The subclasses are as follows:

• <u>Subclass One</u>: All Class Members who had 30 minutes wages deducted every shift by Defendants' automatic meal period time deduction (Wage Deduction Subclass)

• <u>Subclass Two</u>: All Class Members who received meal periods more than five hours after clocking in during the Class Period, as shown by defendants' time records, dispatch logs, or other company records (Late Meal Period Subclass)

• <u>Subclass Three</u>: All Class Members who worked shifts more than 10 hours but less than 12 hours during the Class Period (Second Meal Subclass A)

---

[3] Although Plaintiffs' motion states that they seek certification of only eleven subclasses, the Court infers an additional subclass from the pleadings. (*See* Memo. ISO Motion at 1–6.) On page 29 of the memorandum in support of this motion, heading "VII" states that "the B&PC § 17200 should also be certified." Since it is clear that Defendant believed that Plaintiffs were seeking certification of this subclass, the Court will consider this subclass along with the other eleven. However, Plaintiffs **SHALL SUBMIT** a proposed subclass definition for this subclass <u>within 14 days of the date this Order is electronically docketed</u>.

- • <u>Subclass Four</u>: All Class Members who worked shifts more than 12 hours during the Class Period (Second Meal Subclass B)

- • <u>Subclass Five</u>: All Class Members who worked shifts between 5 five hours and one minute and 10 hours during the Class Period whose time records show no meal period taken (General Meal Period Subclass)

- • <u>Subclass Six</u>: All Class Members who worked shifts in excess of three and one-half hours during the Class Period (Rest Period Subclass)

- • <u>Subclass Seven</u>: All Class Members subject to Defendants' policy during the Class Period requiring tools but not reimbursing the costs (Un-reimbursed Tools Subclass)

- • <u>Subclass Eight</u>: All Class Members subject to Defendants' policy during the Class Period of not reimbursing the costs for lost or stolen tools (Replacement Tools Subclass)

- • <u>Subclass Nine</u>: All Class Members subject to Defendants' policy during the Class Period of not reimbursing the costs of tools purchased in addition to those listed as required (Additional Tools Subclass)

- • <u>Subclass Ten</u>: All Class Members whose pay records during the Class Period were inaccurate (Record-Keeping Penalties Subclass)

- • <u>Subclass Eleven</u>: All Class Members owed wages at the time of separation from employment during the Class Period (Waiting Time Penalties Subclass)

- • <u>Subclass Twelve</u>: Unfair Business Practices

Unlike the first motion for class certification, Defendant concede that these class definitions "would allow the Court to determine [class] membership through objective criteria." (Opp. at 1–2.) Given that there is no dispute, the Court finds that this class is adequate.

## II. RULE 23(A) REQUIREMENTS

Plaintiffs invest little in their discussion of the requirements of Rule 23(a) and Defendant fails to address them at all. Even though this issue is not in dispute, the Court must still conduct an independent inquiry to determine whether Plaintiffs have shown that this case meets the provisions of Rule 23(a). *See Doninger*, 564 F.2d at 1308. After conducting that inquiry the Court finds that Plaintiffs have carried their burden with respect to Rule 23(a).

A.      Numerosity

Rule 23(a)(1) requires that "the class [be] so numerous that joinder of all members is impracticable." Plaintiffs claim that during the class period, "approximately 349 individuals . . . were employed by PENSKE as 'Driver/Installers' and/or 'Installers' assigned to the Whirlpool account." (Memo. ISO Motion at 15.) They suggest that given this number of Plaintiffs, "joining all members [is] impracticable," especially "where many workers may be hesitant to make claims against their employer." (*Id.*)

"The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980). Courts have found joinder impracticable in cases involving as few as forty class members. *See Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 482 (2d Cir. 1995) (stating that numerosity is "presumed at a level of 40 members"); *Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258, 262 (S.D. Cal. 1988) ("As a general rule, classes of 20 are too small, classes of 20-40 may or may not be big enough depending on the circumstances of each case, and classes of 40 or more are numerous enough."). Since the proposed classes would have well over three hundred members, the Court finds that the class is sufficiently numerous to meed Rule 23(a)(1).

B.      Commonality & Typicality

Under subsection (a)(2), the Plaintiff must show "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). The Ninth Circuit has described these requirements as "minimal." *Id.* at 1020. Commonality "is not defeated by slight differences in class members' positions." *Blackie*, 524 F.2d at 902.

Subsection (a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon*, 976 F.2d at 508 (citation omitted). However, "[t]he commonality and typicality

requirements . . . tend to merge" because both focus on the similarities in claims across the class. *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). Assessing typicality requires a three-part inquiry: (1) "'whether other members have the same or similar injury, [(2)] whether the action is based on conduct which is not unique to the named plaintiffs, and [(3)] whether other class members have been injured by the same course of conduct.'" *Hanon*, 976 F.2d at 508 (quoting *Shwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985)). This test does not require that the representative claims "be substantially identical" to those of absent class members, only that they are "reasonably co-extensive." *Hanlon*, 150 F.3d at 1020. Nor does Rule 23 require a class representative for each job category that may be included in the class. *Staton*, 327 F.3d at 957.

In this case, Plaintiffs claim that their "Complaint and Notice of Motion detail numerous common questions of law and fact amenable to class treatment." (Memo. ISO Motion at 16.) These include, for example, "Defendants' liability with respect to wage forfeiture due to the 'auto-deduct policy, the failure to provide for timely and compliant meal periods and/or rest periods (or compensation in lieu thereof), and the failure reimburse employees for installation tools." (*Id.* (unclosed quotation mark in original).)

Further, according to Plaintiffs their claims are typical of the class members' claims. Mr Dilts "was a 'driver/installer' during the class period, while both [Mr. Rios] and [Mr. Dushaj] were 'installers.' All were assigned to Defendant's Whirlpool appliance account and subject to the Defendants' 'auto-deduct' policy. They worked at the Ontario/Perris facility, which was one of the largest to serve the Whirlpool account, and they have shown that they were also subject to uniform practices of the company that discouraged or *prevented* timely and uninterrupted meal and rest periods." (Memo. ISO Motion at 17 (emphasis in original).) They also claim to have been "subject to *all* the Defendant's tool policies." (*Id.*)

The Court finds both commonality and typicality. Plaintiffs have identified common factual questions, such as whether Defendants' policies deprived the putative class members of meal periods, rest periods, overtime pay, and reimbursement for installation tool expenses, and common legal questions, such as Defendants' obligations under California Labor Code §§ 201–03, 226, 226.7, 512, 1174, and 2802 and California's Unfair Competition law. (*See also* Reply at 6–8 (giving a full listing

of Plaintiffs' alleged common fact and law).)  These commonalities are sufficient to satisfy Rule 23(a)(2).  *See, e.g.*, *Campbell v. PricewaterhouseCoopers, LLP*, 253 F.R.D. 586, 594–95 (E.D. Cal. 2008); *Sepulveda v. Wal-Mart Stores, Inc.*, 237 F.R.D. 229, 242 (C.D. Cal. 2006) (reversed on other grounds by *Sepulveda v. Wal-Mart Stores Inc.*, 275 Fed. App'x. 672 (9th Cir. 2008)).

Further, Plaintiffs have provided evidence that indicates that they were subject to all of these alleged wrongs and that the relevant policies were common across Defendant's California facilities. Although the claim for failure to provide tools is unique to one facility, Plaintiffs have separated this claim out in such a way that it would effectively only include those subject to the policy.  Further, two of the Named Plaintiffs were subject to that policy.  As such, the Court finds that both Rule 23(a)(2) and (a)(3) have been satisfied.

C.    Adequacy

Finally, under Rule 23(a)(4) class representatives must "fairly and adequately protect the interests of the class."  "The determination that a party would adequately protect the interests of the class is a question of fact that depends on the circumstances of each case."  *McGowan v. Faulkner Concrete Pipe Co.*, 659 F.2d 554, 559 (5th Cir.1981).  There are two prongs to this inquiry: "(1) that the proposed representative Plaintiffs do not have conflicts of interest with the proposed class, and (2) that Plaintiffs are represented by qualified and competent counsel." *Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1185 (9th Cir. 2007) (citing *Hanlon*, 150 F.3d at 1020).

Plaintiffs argue that there is "no evidence of conflict or antagonism . . . between the proposed Class Representatives, their attorneys, or the putative Class."  (Memo. ISO Motion at 17.)  They further claim that their "attorneys are experienced class action litigators [who] almost exclusively prosecute of (sic) class actions."  (*Id.*)  In light of these arguments, the Court **SHOULD FIND** that Plaintiffs are adequate class representatives under Rule 23(a)(4).

**III.    CLASS CERTIFICATION UNDER RULE 23(B)**

As stated above, a class must meet all of the elements of Rule 23(a) and the elements of at least one subdivision of Rule 23(b). Fed. R. Civ. P. 23(b).  In their renewed motion, Plaintiffs focus solely on subdivision 3. (*See* Memo. ISO Motion at 21–27.)  Rule 23(b)(3) permits a class action where "the court finds that the questions of law or fact common to class members predominate over any questions

affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  The wording of this rule requires that the Court find both predominance and superiority prior to granting class certification.

A.      The Predominance Requirement

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods. v. Windsor*, 521 U.S. 591, 623 (1997).  "In contrast to Rule 23(a)(2), Rule 23(b)(3) focuses on the relationship between the common and individual issues."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir.1998).  "'When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis.'"  *Id.* (citation omitted).  Put another way, the question is whether issues "'subject to generalized proof . . . predominate over those issues that are subject only to individualized proof.'"  *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001) (quoting *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228 1233 (11th Cir. 2000)) (abrogated on other grounds by statute).

"Because no precise test can determine whether common issues predominate, the Court must pragmatically assess the entire action and the issues involved."  *Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 489 (E.D. Cal. 2006).  This "requires an assessment of the relationship between individual and common issues" which "takes into consideration all factors that militate in favor of, or against, class certification."  *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 946 (9th Cir. 2009)).  "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy."  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996); *see also In re Wells Fargo Home Mortgage Overtime Pay Litig.*, 571 F.3d 953, 958 (9th Cir. 2009) ("Whether judicial economy will be served in a particular case turns on close scrutiny of 'the relationship between the common and individual issues.'" (quoting *Hanlon*, 150 F.3d at 1022)).  This is the "overarching focus" of the Court's inquiry.  *Vinole*, 571 F.3d at 946 (citing *Zinser v. Accufix Research Ins., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001)).

//

1             1.       Wage forfeiture subclass

2          Plaintiffs' wage forfeiture subclass seeks recovery under California Labor Code §§ 221–24.

3    (Memo. ISO Motion at 1.)  According to Plaintiffs, Defendant "violates Labor Code § 221 every

4    single day a [putative class member] does not take a meal break, forfeiting wages earned by those

5    drivers who worked through meal periods and 'diverting' those funds into its own pockets."  (*Id.* at

6    19.)  They claim their  evidence "suggests this happens on a widespread basis as a common result of

7    [Defendant's] common practices."  (*Id.*)

8          Further, under Industrial Welfare Commission Wage Orders Nos. 4 & 9, "<u>employers</u> have an

9    obligation to keep accurate records of all hours worked including meal periods."  (Reply at 12

10   (emphasis in original).)  According to Plaintiffs, by not actually determining whether the employees

11   took their meal and rest breaks, "the eTime auto-deduct will inevitably lead to days where time

12   actually worked exceeds time that the employer pays in wages."  (Reply at 12.)  Exacerbating this

13   problem is that the employees cannot recoup any time improperly deducted.  (Memo. ISO Motion at

14   19.)

15         Plaintiffs' argue that since employees are unable to undo this deduction, they will inevitably

16   be paid less than they earned.  (*See* Reply at 13–14.)  They note that at a minimum, presuming an

17   employee waives their right to a meal period, Defendant saves thirty minutes worth of salary.  Since

18   many employees regularly work more than 8 hours per day, that savings would be thirty minutes of

19   overtime pay.  If the employee does not waive the meal period and is not provided such a period,

20   Defendant saves both the thirty minutes of salary and an additional hour of "premium pay" mandated

21   by statute.  (*See geneally* Memo ISO Motion at 10–11.)    Plaintiffs conclude that "Penske's 'auto-

22   deduct' policy which requires the driver to turn in a listed lunch time on the dispatch log to the clerk

23   at the end of the day is likely unlawful because it places the burden for keeping accurate time records

24   on the *employee*."  (Reply at 12 (emphasis in original).)

25         Defendant's response is that the "Plaintiffs . . . took meal breaks during the course of their

26   employment" and "[o]n the days that they took meal breaks, the 'auto-deduct' policy did not cause

27   them to lose any compensation."  (Opp. at 21.)  Further, "Plaintiffs cannot prove [this] claim without

28   first offering evidence to prove that they missed a meal break."  (*Id.*)  This is, according to Defendant,

because there is no common way to prove that "Penske *prevented* [class members] from taking meal and rest breaks through the application of a *uniform policy or systemic practice*." (*Id.* at 10 (emphasis in original).) Defendant notes that "[o]n the days that [employees] took meal breaks, the 'auto-deduct' policy did not cause them to lose any compensation to which they were entitled." (*Id.* at 21.) It argues, without support, that Plaintiffs would "have to prove that, on the whole, they were actually harmed by the practice." (*Id.* at 22.)

Defendant also argues that common issues do not predominate because "the existence of an automatic deduction of 30 minutes to reflect the lunch period that Penske employees were expected to take does not tend to demonstrate whether any particular employee actually missed a meal period." (*Id.* at 21.) Since Plaintiffs "have offered no method of proving their meal and rest break claims without the testimony of each absent class member," it would be improper to certify this class. (*Id.* at 21.)

After reviewing these arguments, the Court finds that common issues predominate with respect to this subclass. The ultimate underlying factual issue is the existence of the thirty minute auto-deduct. If class members were not paid for time they actually worked, then Defendant is liable. And there is no question that Defendant deducted thirty minutes per day regardless of whether a break was taken. Thus, the common issues predominate over the individual issues on the question of liability. As to measure of damages, that will require more individualized inquiry. However, individualized questions going to damages do not preclude a finding that common questions predominate. *Blackie*, 524 F.2d at 905 ("The amount of damages is invariably an individual question and does not defeat class action treatment.").

2.    Meal and rest period subclasses

Plaintiffs' next five subclasses involve alleged meal and rest period violations.[4] California Labor Code sections 226.7 and 512 set the statutory parameters for Defendant's duties with respect to meal and rest periods. Section 512 requires an employer to "provid[e its] employee with a meal

---

[4] Although there are four meal period subclasses and one rest period subclass, both Plaintiffs and Defendants present their arguments regarding these subclasses in combined form. (*See, e.g.*, Memo. ISO Motion at 21–27; Opp. at 10–20.) Given that the common evidence with respect to these matters is identical, they are dealt with in aggregate here.

period of not less than 30 minutes" for any "work period of more than five hours per day."  Cal. Lab. Code § 512(a).  It also requires the employer to "provid[e] the employee with a second meal period of not less than 30 minutes" when the work period exceeds 10 hours per day.  *Id.*  The first meal period "may be waived by mutual consent," and the second may also be waived but only if the employee did not waive the first meal period.  *Id.*

Section 226.7 contains two subsections.  Subsection a provides: "No employer shall require any employee to work during any meal or rest period mandated by an applicable order of the Industrial Welfare Commission."  Cal. Lab. Code § 226.7(a).  Under subsection b, "If an employer fails to provide an employee a meal period or rest period in accordance with an applicable order of the Industrial Welfare Commission, the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal or rest period is not provided."  *Id.* § 226.7(b).

Industrial Welfare Commission ("IWC") Wage Order 4-2001, contained in 8 Cal. Code Regs § 11090, contains the relevant regulatory details.  With respect to meal periods, it states that "Unless the employee is relieved of all duty during a . . . meal period, the meal period shall be considered an 'on duty' meal period and counted as time worked.  An 'on duty' meal period shall be permitted only when the nature of the work prevents an employee from being relieved of all duty and when [there is a] written agreement."  8 Cal. Code Regs. § 11090(11)(C).  It also specifies that when an employee works a shift of more than 12 hours, their second meal period may not be waived.  8 Cal. Code Regs. § 11090(11)(B).  Finally, where "an employer fails to provide an employee a meal period . . . the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the meal period is not provided."  *Id.* § 11090(11)(D).

As to rest periods, section 12(A) of the Wage Order provides: "Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period."  *Id.* § 11090(12)(A).  It explains that employees should have ten minutes of rest period per four hours of work.  *Id.*  Where the employee does not receive the rest period, "the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation."  *Id.* § 11090(12)(B).

Plaintiffs argue that the meal and rest break claims turn largely on Defendant's policies.  For example Plaintiffs suggest seven common policies and company-wide practices which "actively discouraged or prevented . . . employees from taking meal periods."  (Memo. ISO Motion at 11.)

> (1) PENSKE managers overseeing the Whirlpool account throughout the state regularly emphasized that breaks were not be taken until all installations were completed; (2) PENSKE never instituted a policy that either used the dispatch schedule to include a designated meal period nor did the company allow dispatchers to acknowledge, record or document when and if meal periods were actually taken; (3) PENSKE's use of a uniform scheduling algorithm resulted in delivery trucks being filled to capacity and built-in unrealistic installation and traffic estimates so that "driver/installers" were always at risk of maxing-out their regulatory "hours of service limits;" (4) PENSKE engaged in a common uniform policy and practice that required [class members] to be in constant communication with dispatch, management and customers and prevented them from turning off such devices during breaks; (5) PENSKE implemented a uniform policy that shifted the record-keeping requirement for meal periods to the driver/installer, who was told to record meals on the daily dispatch log, rather than be maintained by a central dispatch. The standard log included only one place entry of a single meal period and did not document whether the "installer" took a meal period[;]  (6) PENSKE policy was to require a meal period to be recorded on the dispatch log before clerks were permitted to accept the end of day paperwork and allow the [class members] to clock out.  This resulted in anecdotal evidence of clerks directing employees to fabricate a meal period entry whether taken or not; and (7) PENSKE managers, who were focused on maximizing productity (sic) and maintaining customer service engaged in a common practice of ridiculing, criticizing and/or reprimanding employees who returned to the yard with uninstalled appliances in a given workday.

(*Id.*)  Further, they claim that these policies resulted in meal periods actually taken occurring "long after the fifth hour of work." (*Id.* at 12.)  Even given these alleged policies, Defendant's "corporate representative could not identify a single instance during the class period where an 'auto-deduction' was reversed, nor was he aware of whether the capability of a manual override was ever communicated to employees or on-site managers." (*Id.* at 10)  Nor has Defendant ever "paid a (sic) additional hour of compensation to any class member in lieu of missed lunch break." (*Id.* at 10; Pl.s' Statement of Fact #18.)

As to second meal breaks, Plaintiffs note that "Declarants consistently testify that they were never informed of right to second meal." (*Id.* at 13.)  Defendant's "meal period policy also failed to specifically include the requirement for a second meal period.  (*Id.* at 12.)  Beyond that, "[n]one of the dispatch logs produced in this case show a second meal period for shifts exceeding 10 hours"[5] and

---

[5] However, it must be noted that "the standard dispatch logs only provided space for the driver to enter a single lunch time, and no space for a second meal period." (Memo. ISO Motion at 12.)

08cv318

Defendant "has no record or evidence of employee 'waivers' for meals for shifts over ten but less than 12 hours." (*Id.* at 12–13.)  This is allegedly supported by Defendant's "[c]orporate representative testimony." (*Id.* at 13.)  Finally, Plaintiffs claim that the time records produced to this point "show large percentage (sic) of shifts over 10 hours and over 12 hours." (*Id.*)

And, as mentioned above, Plaintiffs believe that the practices violate "the plain language of both Wage Order 4 and 9, [and] Labor Code §226.7" because they "place[] the burden for keeping accurate time records on the employee.  Without some diligence on the part of the employer to enforce, monitor or audit whether lunches are in fact taken, the auto-deduct will inevitably lead to days where time actually worked exceeds time that the employer pays in wages." (*Id.* at 23.)

To prove the alleged "pattern and practice of employees working without meal periods, being interrupted during meal periods, and being required to remain with PENSKE property during meal periods," Plaintiffs intend to rely on "Defendant's own records, written policies, corporate testimony and failure to document any second meal periods for the [class members] during the class period" and, according to Plaintiffs, "present a unifying common and predominant question of law and fact." (*Id.* at 25 & 26.)  Finally, they argue that any the differences between individual class member claims affect only damages and not the underlying liability. (*Id.* at 19.)

Defendant asserts that "Plaintiffs must demonstrate, by way of *common proof*, that Penske *prevented* them from taking meal and rest breaks pursuant to a *uniform policy or systemic practice*." (Opp. at 10 (emphasis in original).)  Defendant claims that Plaintiffs have "not even suggest[ed] that Penske had *any* policy that operated to *preclude* the taking of meal and rest breaks on a uniform basis across the putative class."[6] (*Id.* at 13 (emphasis in original).)  Instead, Plaintiffs "testified that they frequently did take meal breaks, and their decisions regarding whether to take them depended on the circumstances of the particular day."[7] (*Id.*)  Moreover, Plaintiffs have only offered the Court "anecdotal evidence" that cannot avoid individualized inquiry into the "*whether*, *when*, and *why*" of

---

[6] According to Defendant, "the only Penske *policy* susceptible to common proof for the class as a whole is . . . [the] uniform auto-deduct system that expects all drivers and installers to take meal breaks (as opposed to a policy *not* to take meal breaks)." (Opp. at 11 (emphasis in original).)

[7] Defendant also argues that Plaintiffs' proof is inadequate because the declarations submitted are inconsistent with earlier deposition testimony. (*See* Reply at 19–21.)

1   missed breaks. (*Id.* at 11 (emphasis in original).) Defendant emphasizes that "the *reasons* why breaks

2   were missed or delayed" are key to questions of liability. (*Id.* at 17–18 (emphasis in original).)

3          Defendant also argues that it would be improper to establish liability through surveys,

4   sampling, or statistical extrapolation and that California cases involving those techniques were about

5   damages. (*Id.* at 14–15.) They criticize Plaintiffs' expert, arguing that he "provides this Court with

6   no method of proving the claims of the absent class without their participation at trial." (*Id.* at 16.)

7   Defendant also argues that the only proper way to litigate these claim is "trial testimony by and cross-

8   examination of each claimant." (*Id.* at 18.) Regardless, "Plaintiffs have offered no analysis that would

9   provide this Court with a basis for substituting an as yet undisclosed statistical survey for evidence

10  that is uniquely within each employee's purview." (*Id.* at 20.)

11         Given the facts, the Court finds that Plaintiffs have demonstrated that common issues of law

12  and fact predominate. The first issue to deal with is the employer's obligation with respect to meal

13  periods under California law. The legal uncertainty about this issue has been a recent source of

14  heartburn for courts. Although it is presently before the California Supreme Court in *Brinker*

15  *Restaurant v. Superior Court*, until that decision has issued this Court must proceed as best it can.

16         As such, the Court finds that California meal break law requires an employer to affirmatively

17  act to make a meal period available where the employee are relieved of all duty. *See Cicairos v.*

18  *Summit Logistics, Inc.*, 35 Cal. Rptr. 3d 243, 252–53 (Cal. Ct. App. 2006) ("[T]he defendant's

19  obligation to provide the plaintiffs with an adequate meal period is not satisfied by assuming that the

20  meal periods were taken, because employers have 'an affirmative obligation to ensure that workers

21  are actually relieved of all duty.'"); *Brown v. Fed. Express Corp.*, 249 F.R.D. 580, 585 (C.D. Cal.

22  2008) ("It is an employer's obligation to ensure that its employees are free from its control for thirty

23  minutes."). An illusory meal period, where the employer effectively prevents an employee from

24  having an uninterrupted meal period, does not satisfy this requirement. *Cicairos*, 35 Cal. Rptr. 3d at

25  252–53; *Brown*, 249 F.R.D. at 585. However, the employee is not required to use the provided meal

26  period.

27         Thus, the question here is whether Defendant, by its policies, failed to provide meal breaks to

28  the putative class members. Or, put another way, whether Defendant's policies effectively denied

driver/installers and installers uninterrupted lunch periods.  The majority of Plaintiff's evidence as to this question is anecdotal, consisting of the declarations of driver/installers and installers.  (*See* Pl.'s Statement of Fact ## 28, 29, & 31.)  Plaintiffs also offer some evidence from an employee of Defendant stating that dispatchers did not schedule lunches.  (Hill Decl., Ex. 32 (Bloodworth Dep.) at 22:12–22.)

The evidence also indicates that truck activity was tracked by Defendant's "corporate XATA satellite positioning" system.  (Memo. ISO Motion at 2.)  Defendant also "provided each driver/installer a Nextel device for communication with the dispatchers, supervisor and customers during the day." (*See, e.g.*, *id.* at 8.)  This information is probative of whether breaks were received and whether Defendant's policies prevented uninterrupted meal breaks.  The evidence also suggests that employees could not indicate that they had not taken a meal break and that Defendant never paid a premium wage for a missed break.  (*See* Pl.'s Statement of Fact # 12.)  Morever there seems to be no debate that Defendant's policies did not account for the statutorily mandated second meal break.  These assertions should be largely provable through Defendant's records.  Further, to the extent that these policies were informal and enforced through "ridicule" or "reprimand," they should be provable through common representative testimony.  (*See, e.g.*, Hill Decl., Ex. 9 (Davis Decl.) ¶ 4.)

As to Defendant's criticism of Plaintiffs' expert witness, Dr. Phillip C. Gorman, Ph.D, their arguments largely miss the mark.  (Opp. at 14–20.)  First, it is quite plain to the Court that statistical sampling is appropriate in cases like this one.  California and Federal courts have not discouraged the use of statistical sampling in determining class member damages.  *See, e.g.*, *Sav-On Drug Stores, Inc. v. Superior Court*, 96 P.3d 194, 208–09 (Cal. 2004); *Bell v. Farmers Ins. Exchange*, 115 Cal. Rptr. 3d 544, 571–75 (Cal. Ct. App. 2004); *Capitol People First v. Dep't of Developmental Servs.*, 66 Cal. Rptr. 3d 300, 313–14 (Cal. Ct. App. 2007).  As to liability, the use of statistical sampling, at least when paired with persuasive direct evidence, is an acceptable method of proof in a class action.  *See generally Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1276–80 (11th Cir. 2008) (accepting a trial court's extrapolation to absent class members from representative testimony about the duties of store managers).  Thus, certification will not be denied simply because Plaintiffs anticipate using representative evidence at trial.

08cv318

Second, Dr. Gorman's lack of specific proposals for sampling in this case, stems from the fact that Plaintiffs have not been permitted discovery beyond the named class representatives.  (Reply at 17.)  Regardless, the exact details of Plaintiffs' plan are unnecessary to determine whether common issues predominate in this matter.

Finally, the use of representative testimony is not per se violative of Defendant's due process rights.  Although one lower state court in Texas has come to this conclusion, this Court is not persuaded.

In weighing the common and individual issues, the Court finds that common issues predominate.  These claims center around defendant's policies in terms of whether meal and rest breaks were available.  Although drivers' circumstances varied, they were all ultimately controlled by the same set of central policies, including the delivery schedules and auto-deduct system.  These issues are sufficient to find predominance.

### 3.    Reimbursement subclasses

Subclasses 7, 8, and 9 seek reimbursement for money spent by class members to purchase "all reasonable and necessary installation tools."  (Memo. ISO Motion at 5.)  California Labor Code section 2802 requires employers to indemnify employees "for all necessary expenditures or losses incurred . . . in direct consequence of the [employee's] discharge of his or her duties." Cal. Lab. Code § 2802(a).  Plaintiff notes that California courts have "certified expense reimbursement classes and discussed methodologies of proof."  (*Id.* at 32 (citing, *inter alia*, *Estrada v. Fedex Ground Package Sys., Inc.*, 64 Cal. Rptr. 3d 327 (Cal. Ct. App. 2007)).)

Plaintiffs set forth three scenarios where they believe Defendant violated section 2802.  First, Subclass 7 includes circumstances where Defendant required class members to purchase certain basic tools but did not reimburse for the expense of those tools.  (*Id.* at 5.)  Second, Subclass 8 covers Defendant's failure to reimburse class members for tools which were lost or stolen "irrespective of employee fault."  (*Id.*)  Third, Subclass 9 seeks recovery of money expended to purchase "any tool [Defendant] unilaterally determined to be a 'specialty' tool."  (*Id.*)  Plaintiffs believe that "[e]ach claim is readily susceptible to common proof in that [Defendant's] corporate records *show a specific list and costs* associated with basic installation tools" and corporate testimony will establish

Defendant's uniform policies.  (*Id.*)  They also believe that these issues are ripe for common resolution since the class members jobs were uniform and, consequently, the reasonableness of tools can be determined class-wide.  (*Id.*)

Defendant argues that there is no way to prove the claims of absent class members through generalized proof.  (Opp. at 24.)  They claim that to determine whether an expenditure is necessary, there will need to be an inquiry into "the reasonableness of the employee's decisions in incurring the expense."  (*Id.* at 23.)  However, "Plaintiffs' testimony demonstrates that there is no uniformity to this inquiry."  (*Id.*)  In fact, Defendant argues that there is no way for this Court "to determine which putative class members purchased tools, what tools those class members purchased, whether those tools were necessary to perform their jobs, whether the putative class member's decision in (sic) which tools to purchase was reasonable under the circumstances, and whether they requested reimbursement and were refused."  (*Id.*)

They also point to the testimony of several Plaintiffs to demonstrate factual variances.  (*Id.*)  For example, Plaintiff Dushaj purchased tools that "made his job easier" and "never told Penske about the tools that he lost or asked to be reimbursed for the ones he purchased to replace them."  (*Id.*)  Where Plaintiff Dushaj spent between $100 and $150 to replace tools, Plaintiff Rios spent $350.  (*Id.*)  According to Defendant, "[t]his testimony demonstrates that each putative class member would have to take the stand to testify whether they ever purchased any tools and, if so, whether they ever asked for and were refused reimbursement by Penske."  (*Id.*)

Finally, Penske argues that certification is inappropriate because "Plaintiffs offer *no explanation* of how Plaintiffs intend to prove Plaintiffs' claims and those of the absent class through generalized proof."  (Opp. at 23 (emphasis in original).)

The Court finds that Plaintiffs have shown that common issues predominate.  The putative class members were engaged in a common type of job and performed common tasks.  (*See* Memo. ISO Motion at 7–8.)  Given this commonality of employment obligation, an expense which is "necessary" for a class member to do his job would also be "necessary" for any other class member.  And although the measure of damages is a clearly individual issue, such issues do not preclude a finding that common questions predominate.  *Blackie*, 524 F.2d at 905.  Therefore, because the underlying legal

issues and many of the factual determinations are common to all class members, the Court finds that common issues predominate with respect to the reimbursement subclasses.

### 4. Derivative Claims Subclasses

Plaintiffs describe Subclasses 10, 11, and 12 as "derivative claims." (*See* Memo. ISO Motion at 16 n.42.) Subclass 10 seeks damages under "Labor Code section 226(b) which provides penalties for failure to maintain accurate pay and time records." (*Id.* at 5.) Plaintiffs believe that if Defendant did not "accurately state hours worked and wages owed, then liability for penalties can attached (sic) based on the number of violations." (*Id.* at 5–6.) Subclass 11 seeks penalties under Labor Code section 203. (*Id.* at 6.) That section provides that "If an employer willfully fails to pay, . . . in accordance with Sections 201, 201.3, 201.5, 202, and 205.5, any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty." Plaintiffs argue that "if liability is established for wage forfeiture and/or meal and rest period violations, then those affected (i.e., damaged) class members are entitled to additional recovery." (*Id.* at 16 n.42.) Finally, subclass 12 alleges that Defendant engaged in an unfair practice under California Business and Professions Code §§ 17200–203. (*Id.* at 29–30.) "If Plaintiffs establish that meal, rest and wage forfeiture violations, (sic) then the UCL provides a platform for employees to recover unpaid wages as a form of restitution, and also permits injunctive relief to be sought." (*Id.* at 30.)

Defendant responds to these classes by arguing that since "Plaintiffs have failed to demonstrate the propriety of certifying [their first nine subclasses,] they have also failed to demonstrate any basis on which to prove the derivative claims on behalf of the class." (Opp. at 24.)

With respect to these three subclasses, the Court finds that common issues predominate. As both sides agree, if Plaintiffs' other claims can be tried on a class wide basis, these claims are also ripe for class adjudication. Given the numerous common issues detailed above, the Court finds that common questions predominate with respect to these subclasses.

//
//
//
//

B.    The Superiority Requirement

As stated above, the second aspect of certification under Rule 23(b)(3) is "superiority." "A class action is the superior method for managing litigation if no realistic alternative exists." *Valentino*, 97 F.3d at 1234–35.   To determine whether a class action is the superior method of resolving Plaintiffs' claims, the Court considers the Rule 23(b)(3)'s four factors.  *See Zinser v. Accufix Research Ins., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001).  Those factors are: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). "'A consideration of these factors requires the court to focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis.'" *Zinser*, 253 F.3d at 1190 (quoting 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1780 at 562 (2d ed.1986)).  The Court has "broad discretion" when deciding whether class treatment is superior. *Kamm v. Cal. City Dev. Co.*, 509 F.2d 205, 210 (9th Cir. 1975).

Plaintiffs argue that the superiority of class treatment in this case "is self-evident."  (Memo. ISO Motion at 30.)  They claim that unless these classes are certified, "hundreds of relatively low wage employees [will have] to join this action, file individual, uniform actions or, as is more likely, . . . abandon their legal rights altogether."  (*Id.*)  Because of this, anything other than class treatment would result in "manifest" inefficiency and injustice.  (*Id.*)  Finally, they argue that the four factors in Rule 23(b)(3) indicate that class treatment is superior.  (Reply at 19–20.)

Defendant does not squarely address the superiority of a class action, though they state several times that Plaintiffs have failed to demonstrate superiority.  (*See, e.g.*, Opp. at 24 ("[T]he class action device is not a superior method for resolving Plaintiffs' claims.").)

The Court finds that class action treatment is superior.  The individual class members' interests are relatively small, meaning that they have little interest in controlling the prosecution of separate actions. (Memo. ISO Motion at 30; Reply at 19.)  According to Plaintiffs', there are no other known

pending similar actions. (Reply at 19.) Further, given that all of the Plaintiffs' claims arise from their employment in California and that this case tuns on California labor law, it is desirable to concentrate the litigation in this forum.

The only concern about certifying this matter is whether managing this case as a class action would be unreasonably difficult. As discussed above, much of the evidence will be common to all class members. Further, Plaintiffs present an expert declaration that it will be possible to use statistical evidence. Although Plaintiffs' expert is vague about how that would be done, the declaration indicates that proof in this matter would not be unmanageable. As to damages, the parties should explore alternative means of resolving the individual issues through alternative means such as "administrative mini-proceedings, special master hearings, and specially fashioned formulas or surveys." *Tierno v. Rite Aid Corp.*, 2007 WL 4166028, at *2 (N.D. Cal. Nov. 19, 2007).

## CONCLUSION

Therefore, because all of the requirements of Rule 23(a) are satisfied, common questions predominate with respect to all of the subclass, and class treatment is superior, the Court **GRANTS** Plaintiffs' motion to certify and certifies the proposed class and subclasses. Further, Plaintiffs **SHALL SUBMIT** a proposed subclass definition for the Section 17200 subclass within 14 days of the date this Order is electronically docketed.

IT IS SO ORDERED.


DATED: April 26, 2010

*Janis L. Sammartino*
Honorable Janis L. Sammartino
United States District Judge

08cv318